AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**LODGED**
CLERK, U.S. DISTRICT COURT

07/15/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

7/15/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ___clee___ DEPUTY

United States of America

v.

ANDREW MARNELL,

Defendant(s)

Case No.  2:20-mj-03313

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 11, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344(2) | Bank Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone

_____
*Complainant's signature*

James Shields, Special Agent, FHFA-OIG
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       July 15, 2020

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

### AFFIDAVIT

I, James Shields, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.   I am a Senior Special Agent ("SSA") with the Federal Housing Finance Agency – Office of Inspector General ("FHFA-OIG") and have been so employed since January 2013.  From approximately November 2009 to January 2013, I was a duly authorized and sworn Special Agent of the Department of Housing and Urban Development – Office of Inspector General ("HUD-OIG").  In April 2010, I completed the Criminal Investigator Training Program for federal agents at the Federal Law Enforcement Training Center.  Prior to my employment with HUD-OIG, I was employed as a sworn officer with the United States Department of Homeland Security, Department of Customs and Border Protection ("DHS-CBP") for two years.  From 1997 to 2007, I was on active duty with the United States Navy. In 2006, I graduated with honors from the University of La Verne with a bachelor's degree in Organizational Management.  In 2015, I graduated from the University of Southern California with a Master of Business for Veterans.  I currently hold Certified Fraud Examiner and Accredited Mortgage Professional certifications.

2.   In my position as a SSA with FHFA-OIG, and in my prior positions with HUD-OIG and DHS-CBP, I have conducted numerous investigations of bank fraud, loan fraud, mortgage fraud, identity

1

theft, and other fraud schemes, executed numerous search warrants, and participated in the arrest of numerous suspects.

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, ANDREW MARNELL ("MARNELL") for a violation of 18 U.S.C. § 1344(2) (obtaining money or property from bank under false pretenses).

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This investigation involves a joint investigation of the Federal Bureau of Investigation ("FBI"), the Federal Deposit Insurance Corporation Office of Inspector General ("FDIC-OIG"), Internal Revenue Service Criminal Investigation ("IRS-CI"), the Treasury Inspector General for Tax Administration ("TIGTA"), the Small Business Administration Office of Inspector General ("SBA-OIG"), and FHFA-OIG (collectively, the "federal law enforcement agencies"), and information in this affidavit is based on evidence obtained in the course of the investigation conducted by all the involved federal law enforcement agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

**A.    Summary of Probable Cause**

5.    In or around June 2020, financial institutions informed law enforcement about a possible fraud associated with loan applications submitted in the names of borrowers Quicksilver LLC ("Quicksilver"), Shale Creek LLC ("Shale Creek"), Slatestone LLC ("Slatestone"), Stratrock Ventures LLC ("Stratrock"), and other companies traced to MARNELL (collectively, the "MARNELL-controlled entities").  According to information obtained in the course of the resulting investigation, MARNELL and potentially other co-conspirators submitted fake documents and other false information to obtain loans guaranteed by the Small Business Administration ("SBA") through the Paycheck Protection Program, which is a program created by the Coronavirus Aid, Relief, and Economic Security Act.  The investigation has revealed that MARNELL (and possibly others) sought to obtain more than $10 million (and that MARNELL and possibly others obtained more than $8 million) in PPP loans from various lenders, including TransPecos Banks SSB ("TransPecos"), Fundbox Inc. ("Fundbox"), ReadyCap Lending LLC ("ReadyCap"), Customers Bancorp Inc. ("Customers Bank"), and Kabbage Inc. ("Kabbage"), and that MARNELL (and possibly others) used the PPP loan proceeds to gamble at the Bellagio Hotel & Casino and other gambling establishments and to fund a futures trading account at Charles Schwab & Co, Inc. ("Schwab").  The investigation has also revealed that MARNELL is fraudulently obtaining, possibly with co-conspirators, other loans from the

SBA under the Economic Injury Disaster Loan Program, and using the proceeds at casinos and for other unapproved purposes.

**B.    Paycheck Protection Program**

6.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.    In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

4

8.    A PPP loan application must be processed by a
participating lender.  If a PPP loan application is approved,
the participating lender funds the PPP loan using its own
monies, which are 100% guaranteed by Small Business
Administration (SBA).  Data from the application, including
information about the borrower, the total amount of the loan,
and the listed number of employees, is transmitted by the lender
to the SBA in the course of processing the loan.

9.    PPP loan proceeds must be used by the business on
certain permissible expenses—payroll costs, interest on
mortgages, rent, and utilities.  The PPP allows the interest and
principal on the PPP loan to be entirely forgiven if the
business spends the loan proceeds on these expense items within
a designated period of time after receiving the proceeds and
uses a certain amount of the PPP loan proceeds on payroll
expenses.

**C.   TransPecos Loans**

10.    On July 9, 2020, I participated in an interview of
Jack A. Starks, Jr., who is the Senior Vice President of
Compliance/Legal/IT for TransPecos.  I have also reviewed
information and supporting documentation that TransPecos
provided to law enforcement investigators.  Based on these
sources, I know the following:

a.    In or about May 2020, TransPecos issued three PPP
loans totaling more than $3.5 million to MARNELL-controlled
businesses, namely, Shale Creek, Quicksilver, and Slatestone.
Although the loan applications listed "Tyler Lerman," "Andrew

5

Merrill," and "Andrew Maxwell," as the principals of these entities, as discussed below, information obtained in the course of the investigation indicates MARNELL and potentially other co-conspirators were the ones submitting the applications and receiving the funds.

      b.   Between April 5 and April 16, 2020, TransPecos received an application and supporting documentation for a PPP loan in the amount of $439,000 for borrower Shale Creek, which was represented to be a Montana-headquartered firm, owned and controlled by "Tyler Lerman."  It was represented that Shale Creek had 26 employees and average monthly payroll expenses of $175,600.[1]  It was further represented that "the Applicant has not and will not receive another loan under the Paycheck Protection Program," and that the applicant did not own any other business or have common management with any other business.  Based on information and documents submitted in support of the loan application, TransPecos approved and funded

---

    [1] I and other federal law enforcement agents have reviewed bank records and other financial records associated with MARNELL to attempt to determine whether Shale Creek, and any of the other MARNELL-controlled entities identified in this affidavit, are functional companies that employ the individuals identified in payroll records submitted in support of the loan applications.  Although the investigation is ongoing, I have seen no evidence thus far that Shale Creek is a functioning company (other than being registered with the Wyoming Secretary of State), nor any evidence that it has any employees, any payroll expenses, or conducts any business whatsoever.  Along similar lines, I have seen no evidence thus far that any of the MARNELL-controlled entities are functioning companies (other than being registered with various Secretaries of State), nor any evidence that they employ anyone, have any payroll expenses, or conduct any business whatsoever.  They appear to be shell companies that exist solely for the purpose of carrying out this and other fraud schemes.

the requested loan, and transferred the loan proceeds via ACH to account ending x2842 at United Missouri Bancshares (UMB) Financial Corporation ("UMB Bank").  Investigators are still attempting to trace these funds.

      c.   Between April 13 and May 6, 2020, TransPecos received an application and supporting documentation for a PPP loan in the amount of $1,341,700 for borrower Slatestone, which was represented to be a Wyoming-headquartered firm, owned and controlled by "Andrew Merrill."  It was represented that Slatestone had 75 employees and average monthly payroll expenses of $536,680.  It was further represented that "the Applicant has not and will not receive another loan under the Paycheck Protection Program," and that the applicant did not own any other business or have common management with any other business.  It was also represented that loan proceeds would be used for payroll and other business expenses.  Based on information and documents submitted in support of the loan application, TransPecos approved the requested loan, and on or about May 11, 2020, TransPecos funded the loan, transferring the proceeds via ACH to account ending x2627 at JPMorgan Chase Bank ("JPMC Bank"), which investigators have traced to a Schwab account in MARNELL's name; records from Schwab indicate MARNELL used these PPP loan proceeds to fund a futures trading account at Schwab (which lost more than $500,000 in May 2020 alone) and to fund a $150,000 wire transfer to the Bellagio Hotel & Casino,

for gambling and entertainment expenses, as will be discussed in more detail below.[2]

        d.    Between April 23 and May 11, 2020, TransPecos received an application and supporting documentation for a PPP loan in the amount of $1,818,000 for borrower Quicksilver, which was represented to be a Montana-headquartered firm, owned and controlled by "Andrew Maxwell."  It was also represented that Quicksilver had 139 employees and an average monthly payroll of $727,200.  It was further represented that "the Applicant has not and will not receive another loan under the Paycheck Protection Program," and that the applicant did not own any other business or have common management with any other business.  It was also represented that loan proceeds would be used for payroll and other business expenses.  Based on information and documents submitted in support of the loan application, TransPecos approved and funded the requested loan, and transferred the loan proceeds via ACH to account ending x6279 at Live Oak Banking Company ("Live Oak"), a business account held Quicksilver's name and on which MARNELL is the sole signer.  According to TransPecos, they were able to recover the funds associated with this loan from Live Oak.  I have spoken to a representative of the Federal Reserve Bank of Atlanta, who confirmed that the ACH transfer of the loan proceeds for the

---

[2] As discussed in more detail below, TransPecos was able to recover all of its funds from Schwab, but it appears the monies used to return funds to TransPecos represented PPP loan proceeds from other lenders (laundered through a brokerage and futures trading account at Schwab), as no other transfers or other monies went into any of the relevant Schwab accounts.

Quicksilver loan from TransPecos to Live Oak involved an interstate wire tranfer.

e.   Among the documents and information submitted in support of the PPP loans sought from TransPecos were payroll data and forms, including Form 940 tax forms supposedly submitted to the Internal Revenue Service ("IRS") on behalf of borrowers Shale Creek, Quicksilver, and Slatestone.  As indicated in further detail below, however, information obtained from the Treasury Inspector General for TIGTA indicates these Form 940 tax forms were never submitted to the IRS.

f.   According to login records from TransPecos, the same IP addresses were used to access accounts associated with all three TransPecos loans, and one of these IP addresses was 45.49.21.139, which is an IP address traced to Charter Communications Inc. ("Charter Communications").  Information from Charter Communications indicates that, at all relevant times, the IP address was associated with an account held in the name of MARNELL's husband, S.R., and was associated with the SUBJECT PREMISES, ████████████████████████████ ███████████████; a search warrant is being also sought for the SUBJECT PREMISES.  As discussed in more detail below, the SUBJECT PREMISES is the address listed on both MARNELL's and S.R.'s California drivers' licenses and is an address associated with other accounts in MARNELL's name and in accounts maintained in aliases "Andrew Maxwell" and "Andrew Merrill" including accounts associated with other PPP loans.

11.  On July 8, 2020, I participated in an interview of Brad Day, the Bank Secrecy Officer at Live Oak Bank.  I have also reviewed information and documents that Live Oak Bank provided to law enforcement investigators.  Based on these sources, and as relevant to the TransPecos loans, I know the following:

a.   On or about May 8, 2020, two business accounts were opened in the name of Quicksilver by customer "Andrew Marnell," using MARNELL's Social Security Number ("SSN") ending x4394.[3]

b.   A copy of MARNELL's California driver's license was submitted as the identification document associated with the two business accounts opened at Live Oak, along with business entity information for Quicksilver (the same LLC information was provided to both Live Oak and TransPecos for this entity,

---

[3] Based on information obtained from law enforcement databases, consistent with information obtained from financial institutions in the course of this investigation, MARNELL appears to be using at least three different SSNs in his own name (and other SSNs in other names).  Based on these same sources, one of the SSNs he is using in his own name, SSN ending x4394, was issued in or about 1986, which was six years after he was born, according to information in law enforcement databases. According to information reported by financial institutions, MARNELL also appears to be using at least two others SSNs in his own name, one that was issued in or about 1988, and another issued in or about 2003, according to law enforcement databases. For the purpose of this affidavit, when I refer to "MARNELL's SSN," I am referring to the earliest-issued SSN, ending x4394. According to reports that I have reviewed from financial institutions, MARNELL has claimed in the past to have been the victim of identity theft, as an explanation for the multiple SSNs in his name when he was attempting to obtain credit or to try to explain fraudulent credit card charges, but in each of the instances where he reported being the victim of identity theft, the financial institution investigating the claim determined that any such claim was unfounded and was being used to try to avoid responsibility for fraudulent conduct.

specifically the same address and state of incorporation, although different Employer Identification Numbers were listed), and another supposed business entity called xtractd LLC ("xtractd"), which is listed as the borrower on another PPP loan application submitted to a different lender (specifically Customers Bank), as discussed further below.

      c.  On or about May 12, 2020, proceeds from one of the TransPecos loans, in the amount of $1,818,000, were credited to one of MARNELL's Quicksilver business accounts at Live Oak Bank.  TransPecos records indicate this loan was the $1,818,000 PPP loan issued to Quicksilver, supposedly owned and operated by "Andrew Maxwell."  Fraud investigators at Live Oak flagged this transfer (and another discussed below) as possibly fraudulent, froze the funds, and eventually returned them to TransPecos.

    12.  I have reviewed information and documents that Schwab provided to law enforcement investigators, and I have spoken to FDIC-OIG SA Vikas Arora regarding his communications with a Schwab representative concerning relevant accounts.  I have also reviewed reports that various casinos have submitted to law enforcement and have spoken with an assigned agent from IRS-CI regarding her conversations with casino representatives regarding relevant activity.  Based on these sources, I know the following:

      a.  In or about March 2020, a Schwab brokerage account, ending x2726 (the "Schwab x2726 brokerage account"), was opened in MARNELL's name, using MARNELL's SSNs, and his home address (the SUBJECT PREMISES).  In or about June 2020, another

Schwab brokerage account, ending x7759 (the "Schwab x7759 brokerage account"), was opened in MARNELL's name, using MARNELL's SSN and his home address (the SUBJECT PREMISES). At least one of the brokerage accounts was linked to a futures trading account, ending x8828 (the "Schwab x8828 futures trading account," and collectively with the Schwab x2726 brokerage account and the Schwab x7759 brokerage account, the "Schwab accounts"). A brokerage account was also opened in S.R.'s name, but no activity occurred in the account, and it was closed with a zero balance, with fraud indicators.

     b.   The brokerage accounts allowed for uncovered options writing, with margin requirements. I know from training and experience and from discussions with other agents with training and experience in financial markets that uncovered options trading allows a trader (here, the Schwab customer) to sell options without holding an offsetting position in the underlying security (also known as selling a "naked option"), and in this type of option trading, the seller of the option runs the risk that the buyer will exercise an in-the-money option, and the seller may have to acquire a position quickly in the underlying security, potentially at a significant loss. This type of options trading carries significant risks because of the limited upside profit potential (which is the premiums paid on the option), and the significant downside loss potential (which could vary depending on the volume of options traded and volatility of the underlying security). At least one of the brokerage accounts was also linked to a futures trading account,

12

which involves all of the same risks of naked options trading, along with additional risks involved in trading futures.

        c.    On or about May 11, 2020, a deposit in the amount of $1,341,700 was received from TransPecos into the Schwab x2726 brokerage account in MARNELL's name, and I know from TransPecos records that these funds represented all or virtually all the proceeds of the PPP loan issued to Slatestone, supposedly owned and operated by "Andrew Merrill," rather than MARNELL, and that the loan issued for the purpose of paying payroll and other business expenses of Slatestone.

        d.    Prior to the $1,341,700 deposit, the Schwab x2726 brokerage account had a zero balance.  Between May 20 and May 22, 2020, more than $1.3 million of the $1,341,700 was transferred from the Schwab x2726 account to the Schwab x8828 futures trading account, which was then used to conduct futures options trading, resulting in a net loss of $525,693 for the month of May 2020.

        e.    After transfers back from the Schwab x8828 futures trading account to the Schwab x2726 brokerage account, $370,484.00 was left in the Schwab x2726 brokerage account at the end of May 2020, and (after commissions and fees were deducted) $421,523.10 was left in the Schwab x8828 futures trading account -- all of this combined amount, or a total of $792,007.10, represented proceeds from the original TransPecos $1,341,700 PPP loan to Slatestone.  No other transfers or other monies went into any of the Schwab accounts in May 2020.

f.   On or about June 1, 2020, a deposit in the amount of $1,842,929.16 was received from Fundbox into the Schwab x2726 brokerage account, and I know from Fundbox records, as discussed below, that these funds represented proceeds of a PPP loan issued to Stratrock, supposedly owned and operated by "S.R.," and that the loan issued for the purpose of paying payroll and other business expenses of Stratrock.

g.   On or about June 5, 2020, a wire in the amount of $150,000 was sent from the Schwab x2726 brokerage account to an account at Bank of America N.A. ("BofA"), ending x6419, held in the name of Bellagio LLC, 3600 S Las Vegas Blvd, Las Vegas, NV 89109 (the "Bellagio account"), which is the corporate name and address for the Bellagio Hotel and Casino (the "Bellagio") in Las Vegas, Nevada.  The wire instruction referenced MARNELL by name and account number in the transmission notes, indicating the $150,000 wire was for his benefit.  Reports from casinos indicate that MARNELL engaged in gambling activity throughout May and June 2020, and that he has been engaged in gambling activity, including at the Bellagio, in varying degrees and amounts since at least 2013.[4]  The $150,000 transfer on June 5, 2020 from the Schwab x2726 brokerage account to the Bellagio, for MARNELL's benefit, represented PPP loan proceeds, because all of the funds in the Schwab x2726 brokerage account at the time of transfer (and at all other times) were traceable to the

---

[4] According to a report from Wells Fargo N.A. ("Wells Fargo"), where MARNELL had worked as a credit analyst, MARNELL was fired from Wells Fargo for embezzling money from the company (through a company credit card) related to gambling activity in June 2018.

TransPecos and Fundbox PPP loans to Slatestone and Stratbox, respectively

      h.  On or about June 18, 2020, a deposit in the amount of $1,842,929.17 was received from Fundbox into the Schwab x7759 brokerage account in MARNELL's name, and I know from Fundbox records, as discussed below, that these funds represented proceeds of a PPP loan issued to Quicksilver, supposedly owned and operated by "Andrew Maxwell." These funds were transferred to the Schwab x2726 brokerage account, also in MARNELL's name, and they were then transferred, along with other remaining funds from the other PPP loans, to the Schwab x8828 futures trading account, which was then used to conduct futures options trading, resulting in a net loss of $2,773,455.40 for the month of June 2020.

      i.  On or about June 22, 2020, $1,341,700 was transferred from the Schwab x2726 brokerage account to TransPecos (representing the full amount of the loan proceeds that TransPecos had transferred to Schwab for MARNELL-controlled entities). It is not clear from account records obtained to date which entity or person initiated the return of these funds to TransPecos. However, account records indicate that the transfer was funded through transfers from the Schwab x8828 futures trading account, which itself was funded solely through transfers of PPP loan proceeds from the Schwab x2726 brokerage accounts. At all times, other than PPP loan proceeds, no other transfers or other monies went into any of the Schwab accounts,

and trading activity in those accounts did not result in any net gains to the accounts, but rather resulted in large net losses.

      j.   Although the Schwab accounts collectively had a net negative balance at the end of June 2020, on July 8, 2020, a wire transfer of $200,000 was sent from the Schwab x2726 brokerage account to the Bellagio account, with the same reference to MARNELL in the wire instructions as the previous wire discussed above.  Investigators are still attempting to identify the source of the monies used to fund this wire transfer.  Information from the Bellagio indicates that MARNELL was gambling at the Bellagio from July 9 to July 11, 2020, and that he lost more than $150,000 in those two days.

13.  I have spoken with an assigned special agent from TIGTA and reviewed reports that she prepared, and according to these sources:

      a.   Form 940s are forms that employers file with the IRS to report and ultimately to pay an employer's annual Federal Unemployment Tax Act (FUTA) tax.  All employers that pay payroll are required to file these forms on an annual basis.

      b.   IRS has no record of the Form 940 payroll forms submitted to TransPecos for Shale Creek, Quicksilver, or Slatestone, nor does IRS have any record of any Form 940s or any other payroll records being submitted for these entities or the associated Employer Identification Numbers ("EINs").

14.  Information from the Department of Homeland Security ("DHS") indicates that fake information was submitted to TransPecos as identification for "Andrew Maxwell," the supposed

principal of Quicksilver.  A photograph of what purports to be the inside jacket of a United States passport in the name "Andrew Maxwell," passport number ending x9799 (with what appears to be MARNELL's photograph) was submitted to TransPecos as identification for "Andrew Maxwell," but DHS has no record of this passport being issued in this name -- the passport number is real but belongs to another person.  The same fake passport was used as identification for "Andrew Maxwell" for other PPP loans discussed below.

15.  Based on my training and experience and publicly available information regarding TransPecos, I know that TransPecos is a financial institution, as that term is defined in 18 U.S.C. § 20, that is insured by the Federal Deposit Insurance Corporation.

**D.   FundBox Loans**

16.  I have reviewed information and documents that FundBox provided to law enforcement investigators, and I have also reviewed information and documents from Schwab, and spoken with FDIC-OIG SA Arora regarding his communications with a Schwab representative regarding the Schwab accounts.  Based on these sources, I know the following:

a.   In or about June 2020, Fundbox issued two PPP loans totaling $3,685,858.32 to MARNELL-controlled entities, namely, Stratrock and Quicksilver.  Although the loan applications and other information indicated that the principals of these entities were, respectively, "S.R." and "Andrew Maxwell," other information obtained in course of the

17

investigation indicates MARNELL and potentially others were the ones submitting the applications and receiving the funds. Among other evidence of this, all of the Fundbox PPP loan proceeds were transferred to MARNELL's Schwab accounts and used by MARNELL for options trading and gambling.

b.   On or about May 22, 2020, Fundbox received an application and supporting documentation for a PPP loan in the amount of $1,842,929.16 for borrower Stratrock, which was represented to be a Colorado-headquartered firm, owned and controlled by "S.R." It was also represented that Stratrock had 129 employees and average monthly payroll expenses of $734,593. It was further represented that "the Applicant has not and will not receive another loan under the Paycheck Protection Program," and that the applicant did not own any other business or have common management with any other business. It was also represented that loan proceeds would be used for payroll and other business expenses. Based on information and documents submitted in support of the loan application, Fundbox approved the requested loan for Stratrock.

c.   On or about June 15, 2020, Fundbox received an application and supporting documentation for a PPP loan in the amount of $1,842,929.17 for borrower Quicksilver, which was represented to be a Montana-headquartered firm, owned and controlled by "Andrew Maxwell," with a phone number that was the same as the phone number listed for "Tyler Lerman" in the PPP loan application submitted to TransPecos for borrower Shale Creek. It was also represented to Fundbox that Quicksilver had

18

129 employees and had an average monthly payroll of $734,593. It was further represented that "the Applicant has not and will not receive another loan under the Paycheck Protection Program," and the applicant did not own any other business or have common management with any other business, and that the loan would be used to pay payroll and for other approved business expenses. Based on the information in the application and the documents that were submitted, Fundbox approved the requested loan for Quicksilver.

d.   As discussed above, all of the Fundbox PPP loan proceeds were transferred to MARNELL's Schwab accounts and used for risky and losing options trading and for gambling activities, and as of the end of June 2020, MARNELL had lost all of the Fundbox PPP loan proceeds, leaving the Schwab accounts with a net negative balance.

e.   Among the application documents and information submitted to Fundbox were payroll data and forms, including the same (fake) Form 940 that was submitted to TransPecos for Quicksilver.  The Form 940 tax forms submitted to Fundbox and to TransPecos for borrower Quicksilver were identical, containing the exact same information, including the same Employer Identification Number ("EIN"), and business name and address, with the exception that the form submitted to Fundbox was dated two days before the form submitted to TransPecos, and the form submitted to Fundbox had a signature on it (both forms had signature blocks filled in with the name of "William Kalemeier" as "Treasurer" of Quicksilver, but the only the form submitted

19

to Fundbox had what appeared to be a signature of "William Kalemeier" affixed to it).

       f.   A Form 940 was also submitted for Stratrock, but according to information provided by TIGTA, the IRS has no record of receiving this Form 940 or any Form 940 tax forms or other payroll records for this entity or the associated EIN. The financial information on the Form 940 submitted to Fundbox for borrower Stratrock (i.e., the payroll payments and other numbers reported on the form) was identical to the financial information on the Form 940 submitted to Fundbox for borrower Quicksilver. The Form 940 submitted for Stratrock, like the Form 940 submitted for Quicksilver, was also supposedly signed by "William Kalemeier" as "Treasurer" of Stratrock, and it was dated the same day as the Form 940 submitted for Quicksilver. The only differences between the 940 forms submitted for Stratrock and Quicksilver were the EINs, the names and addresses of the businesses, and the state of incorporation. The forms for these two supposed businesses were otherwise identical, including all of the financial information.

       g.   Among the IP addresses used to submit documents and information for the Stratrock loan was 45.49.21.139, which is the same IP address used to access accounts associated with the TransPecos loans, and the same IP address used to access other financial accounts in MARNELL's name and in the names of aliases "Andrew Maxwell" and "Andrew Merrill," including accounts associated with other PPP loans discussed below, and an

IP address that has been traced to MARNELL and the SUBJECT
PREMISES through Charter Communication records.

17.   Information from DHS indicates that fake information
was submitted to Fundbox as identification for "Andrew Maxwell,"
the supposed principal of Quicksilver.  A photograph of what
purports to be the inside jacket of a United States passport in
the name "Andrew Maxwell," passport number ending x9799 (with
what appears to be MARNELL's photograph) was submitted to
Fundbox as identification for "Andrew Maxwell," but DHS has no
record of this passport being issued in this name –– the
passport number is real but belongs to another person.  This is
the same fake passport that was submitted to TransPecos as
identification for "Andrew Maxwell," who was listed as the
principal of borrower Quicksilver for the PPP loans obtained
from TransPecos, and it is the same fake passport that was
submitted to ReadyCap, another PPP lender discussed below.  The
same email address, amaxwell@eastbaydeco.com, was listed with
both Fundbox and ReadyCap as the email address of "Andrew
Maxwell."

        **E.   ReadyCap Loan**

18.   I have reviewed documents and information that
ReadyCap, Customers Bank, and Live Oak provided to law
enforcement, along with data from a law enforcement database
compiling information concerning PPP loans, and I have spoken to
a Live Oak representative and to another law enforcement
investigator from FHFA-OIG regarding her communications with a
Customers Bank representative regarding a ReadyCap PPP loan

sought in the name of borrower East Bay Associates LLC ("East Bay Associates").  From these sources, I know the following:

a.    Shortly after the PPP program was introduced, Customers Bank partnered with several vendors including ReadyCap, Kabbage, and other financial institutions to offer PPP loans to small businesses.

b.    On or about April 8, 2020, ReadyCap received an application and supporting documents for a PPP loan in the amount of $456,917 for borrower East Bay Associates, which was represented to be a Florida-headquartered firm, owned and controlled by "Andrew Maxwell."  On at least one of the application forms, it was also represented that East Bay Associates employed 27 people and had an average monthly payroll of $182,767.[5]  The IP address used to affix a virtual signature for "Andrew Maxwell" to at least two documents was 45.49.21.139, which is the same IP address used to access accounts associated with the TransPecos loans, other accounts in MARNELL's name, and has otherwise been traced to MARNELL at the SUBJECT PREMISES, PREMISES as described in this affidavit.  It was further represented that "the Applicant has not and will not receive another loan under the Paycheck Protection Program," and that

---

[5] ReadyCap provided at least two versions of the PPP loan application form submitted for East Bay Associates, one dated April 8, 2020, and the other dated April 14, 2020.  On the first of these applications, dated April 8, 2020, it was represented that East Bay Associates had 27 employees and an average monthly payroll of $182,767; on the second version, dated April 14, 2020, it was represented that East Bay Associated had 26 employees and an average monthly payroll of $141,000. Regardless, I have seen no evidence thus far that East Bay Associates is a functional company or has any employees or has any payroll expenses.

the applicant did not own any other business or have common management with any other business.  It was also represented that loan proceeds would be used for payroll and other business expenses.  Based on information and documents submitted in support of the loan application, ReadyCap approved a PPP loan in the amount of $352,500.

          c.   On or about May 18, 2020, an ACH transfer of $352,500 was initiated from Customers Bank to an account at Live Oak Bank, account ending x6912, held in Quicksilver's name, and on which MARNELL was the sole signer, to fund the PPP loan that ReadyCap had issued to East Bay Associates, for "Andrew Maxwell."  According to transfer instructions, the funds were supposed to be transferred to a checking account at Live Oak Bank, but they were frozen because of a discrepancy between the type of account designated in wire instructions and the type of account at Live Oak Bank, which was a savings account.  In addition, fraud investigators at Live Oak Bank identified a discrepancy in the name of the borrower entity on the PPP loan, which was East Bay Associates, and the name of the accountholder, which was Quicksilver, and a difference between the supposed principal of East Bay Associates, "Andrew Maxwell," and the individual signer on the account, which was MARNELL.  As a result, Live Oak Bank froze the funds and ultimately returned them.

      19.  Information from DHS indicates that fake information was submitted to ReadyCap as identification for "Andrew Maxwell," the supposed principal of East Bay Associates.  A

photograph of what purports to be the inside jacket of a United
States passport in the name "Andrew Maxwell," passport number
ending x9799 (with what appears to be MARNELL's photograph) was
submitted to ReadyCap as identification for "Andrew Maxwell,"
but DHS has no record of this passport being issued in this name
-- the passport number is real but belongs to another person.
This is the same fake passport that was submitted to TransPecos
and Fundbox as identification for the "Andrew Maxwell," the name
that was listed as the principal of borrower Quicksilver for the
PPP loans obtained from TransPecos and Fundbox.  The same email
address, amaxwell@eastbaydeco.com, was listed with both Fundbox
and ReadyCap as the email address of "Andrew Maxwell."

     **F.   Customers Bank Loan**

    20.   I have reviewed information provided by Customers Bank
to law enforcement investigators, along with data from a law
enforcement database compiling information concerning PPP loans,
and I have spoken to another law enforcement investigator from
FHFA-OIG about her conversations with a Customers Bank
representative regarding a PPP loan obtained from Customers Bank
in MARNELL's name, and from these sources, I know the following:

        a.   In or about April 2020, Customers Bank received a
loan application for a PPP loan in the amount of $1,352,318 for
xtractd, with the same address and phone number listed for this
entity as that listed for Slatestone in application materials
sent to TransPecos.  The principal of xtractd was listed as
"Andrew Marnell," with MARNELL's SSN.  It was also represented
that xtractd employed 78 people and had an average monthly

payroll of $542,683.59.  It was further represented that "the Applicant has not and will not receive another loan under the Paycheck Protection Program," and that the applicant did not own any other business or have common management with any other business.  It was also represented that loan proceeds would be used for payroll and other business expenses.  Based on information and documents submitted in support of the loan application, Customers Bank approved the requested loan, and on or about April 23, 2020, proceeds in the amount of $1,352,318 were disbursed to a Customers Bank account ending x8371.

b.   Between May 4, 2020, and June 11, 2020, approximately $1.1 million of the PPP loan proceeds for xtractd were further transferred to other accounts, and investigators are still tracing these funds.

21.  Based on my training and experience and publicly available information regarding Customers Bank, I know that Customers Bank is a financial institution, as that term is defined in 18 U.S.C. § 20, that is insured by the Federal Deposit Insurance Corporation.

**G.   Kabbage Loans**

22.  On July 8, 2020, I participated in an interview of Spencer Robinson, the Chief Risk Officer at Kabbage, and I have also reviewed data from a law enforcement database compiling information concerning PPP loans, and from these sources I know the following:

a.   Kabbage is a financial technology company that provides small businesses with products that can help grow their

business.  Kabbage partners with banks to provide capital for
these business products.  When the PPP loan program was
announced, Kabbage applied with the Small Business
Administration ("SBA") to be a non-bank PPP lender.

       b.   In or about June 2020, Kabbage received an
application for a PPP loan in the amount of $1,301,050 for
borrower Slatestone, purportedly owned and operated by "Andrew
Merrill," and based on information and documents submitted in
support of the loan application, Kabbage approved the requested
loan, and an SBA loan number was issued for it.

       c.   The PPP loan did not fund because the borrower
failed pre-funding identification verifications.  Also, because
of the loan amount, it would have required a full manual
underwriting, which did not happen.

       d.   Kabbage had received an additional PPP loan
application in the name of an Arizona-based business whose
principal was represented to be "Andrew Marnell," with MARNELL's
SSN.  This loan also never funded because the borrower again
failed the pre-funding identity verification checks.

    **H.   Information from TD Ameritrade**

23.  I have reviewed information and documents that TD
Ameritrade Inc. ("TD Ameritrade") provided to law enforcement
investigators.  Based on these sources I know the following:

       a.   In or about February and March 2020, accounts
were opened in the name "Andrew Maxwell" and "Andrew Merrill" at
TD Ameritrade.  Previously, in 2018, TD Ameritrade closed

accounts in MARNELL's name because of fraudulent activity and banned him as a future client.

      b.   Login information shows the accounts opened in the names of "Andrew Maxwell" and "Andrew Merrill" were accessed from the SUBJECT PREMISES using IP address 45.49.21.139, which is the same IP address used to access accounts associated with other PPP loan applications, other accounts in MARNELL's name and in the names of his aliases "Andrew Maxwell" and "Andrew Merrill," and has otherwise been traced to MARNELL at the SUBJECT PREMISES.

      c.   I have listened to recordings of two calls that TD Ameritrade representatives had with "Andrew Maxwell" and "Andrew Merrill," and it appears the same person is using both identities, as the voice sounds the same, and also sounds like the same voice on recordings I have reviewed from Live Oak of a customer identifying himself as MARNELL.

      d.   The TD Ameritrade accounts opened in the names of "Andrew Maxwell" and "Andrew Merrill" were closed in or about April 2020 because of fraud indicators.

    **I.**    **Information Concerning Fraud Affecting the Economic Injury Disaster Loan Program**

24.   I have spoken to an assigned special agent from SBA-OIG SA and reviewed documents from the Bellagio including a document that appears to be an account statement from an account maintained at Aspiration Bank in MARNELL's name, and I have spoken with a special agent from IRS-CI who has had further conversations with casino investigators, and from these sources,

I know that, on or about May 22, 2020, applications were filed
for two (2) SBA Economic Injury Disaster Loans ("EIDL"), one on
behalf of xtractd and the other on behalf of Slatestone -- for
both loans MARNELL was represented to be the principal of the
relevant business entities.  In applications for both loans, it
was represented that xtractd and Slatestone each employed 10
people.  The loan for xtractd was approved for $150,000.  On or
about June 11, 2020, SBA disbursed $149,900, the total loan
proceeds less fees, into MARNELL's Aspiration Bank account,
ending in x6538. A review of bank statements revealed that the
loan proceeds were used for personal expenses such as groceries
and home improvement, for cash withdrawals near MARNELL's
residence, and for gambling and entertainment expenses at the
Bellagio.

## IV. <u>CONCLUSION</u>

25.  For all the reasons described above, there is probable cause to believe that, on or about May 11, 2020, ANDREW MARNELL knowingly and with intent to defraud carried out a scheme or plan to obtain money or property from TransPecos through the use of material false statements and promises, namely, MARNELL obtained the proceeds of the PPP loan issued to Slatestone, based on false and fraudulent representations regarding the borrower and the use of proceeds, in violation of 18 U.S.C. § 1344(2) (bank fraud).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  15  day of
  July  , 2020.

_____   STEVE KIM
UNITED STATES MAGISTRATE JUDGE

29